UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
TARIK FARAG and AMRO ELMASRY,

                    Plaintiffs,
       -against-

THE UNITED STATES, WILLIAM PLUNKETT,
and THOMAS SMITH,

                    Defendants.
-------------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 05-CV-3919 (FB) (SMG)

*Appearances*
*For Plaintiffs:*
ANTHONY C. OFODILE, ESQ.
Ofodile & Associates, P.C.
498 Atlantic Avenue
Brooklyn, NY 11217

*For Defendant*s
BENTON J. CAMPBELL, ESQ.
United States Attorney
By: SCOTT R. LANDAU, ESQ.
Assistant United States Attorney
271 Cadman Plaza East, 7th Floor
Brooklyn, NY 11201

## TABLE OF CONTENTS

STATEMENT OF THE CASE ................................................. 4
    Facts ......................................................................... 4
            I.  Events at San Diego International Airport .......................... 5
            II.  Events During the Flight ......................................... 7
            III.  Events at JFK .................................................. 10
            IV.  Events at the Port Authority Police Station ...................... 13
    The Commencement of the Litigation .................................... 15
    The Government's Justification for Its Conduct ........................... 16

DISCUSSION ............................................................... 17
    Summary Judgment Standards ........................................... 18
    *Bivens* and FTCA Claims
            I.  Analytical Framework .......................................... 19
                    A.  Bivens *Claims* .......................................... 19
                    B.  *FTCA Claims* ........................................... 21
                    C.  *Qualified Immunity* ..................................... 22
            II.  Analysis .................................................... 23

1

      A. *Were Plaintiffs Arrested?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
          1. Show of Force and Restraint of Movement
             at the Terminal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
          2. The Jailings and Custodial Interrogations . . . . . . . . . . . . 27
          3. Duration of the Detentions and Interrogations . . . . . . . 29
      B. *Was There Probable Cause for the Arrests?* . . . . . . . . . . . . . . . . . . . . 33
          1. Was There Probable Cause Based on
             Non-Ethnic Factors Alone? . . . . . . . . . . . . . . . . . . . . . . . . . 34
          2. Would Consideration of Plaintiffs' Ethnicity
             Warrant a Finding of Probable Cause? . . . . . . . . . . . . . . 38
          3. Can Plaintiffs' Arab Ethnicity Serve
             as a Probable Cause Factor? . . . . . . . . . . . . . . . . . . . . . . . 39
      C. *Are Smith and Plunkett Entitled to Qualified Immunity?* . . . . . . . . 53
  Remaining Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

**BLOCK, Senior District Judge:**

On August 22, 2004, weeks away from the third anniversary of 9/11,

plaintiffs Tarik Farag ("Farag") and Amro Elmasry ("Elmasry"), both Arabs, flew from San

Diego to New York's John F. Kennedy Airport ("JFK") on American Airlines Flight 236.

They claim that when they deplaned they were met by at least ten armed police officers in

SWAT gear with shotguns and police dogs, ordered to raise their hands, frisked,

handcuffed and taken to a police station, where they were placed in jail cells; they were not

released until about four hours later, after having been interrogated at length during their

imprisonment regarding suspected terrorist surveillance activity aboard the plane. The

investigation yielded absolutely no evidence of wrongdoing.

Alleging that they were unlawfully seized and imprisoned, Farag and

Elmasry have each brought an action under *Bivens v. Six Unknown Named Agents of Federal*

*Bureau of Narcotics*, 403 U.S. 388 (1971), against defendants FBI Special Agent William Ryan Plunkett ("Plunkett") and New York City Police Department Detective Thomas P. Smith ("Smith"),[1] two counterterrorism agents responsible for plaintiffs' seizures, detentions and interrogations. Plaintiffs also sue the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, for Plunkett's and Smith's allegedly tortious conduct.[2] The defendants (collectively, the "Government") now move for summary judgment on the merits; alternatively, Plunkett and Smith seek summary judgment as to plaintiffs' *Bivens* claims on the ground of qualified immunity. Plaintiffs have not cross-moved.

The Government considers this "a case of first impression for the federal courts" because it "presents important questions concerning the scope of legitimate law enforcement activity in response to suspected terrorism-related conduct by passengers on board a domestic commercial aircraft." Def'ts' Mem. of Law in Support of Mot. for Summ. J. (hereinafter "Gov't Br.") at 1. It contends (1) that the agents merely conducted a valid *Terry* stop when they seized, detained and questioned plaintiffs for approximately four hours, or (2) alternatively, if the Court determines that the agents arrested plaintiffs, that there was probable cause to do so. In either case, the Government "take[s] the position that

---

[1]Plaintiffs misidentified Smith's first name as "Timothy" in their complaint, but this error was corrected by stipulation.

[2]Plaintiffs have also brought conspiracy claims and claims under § 1981 against Smith and Plunkett, as well as common-law false-arrest/false-imprisonment claims solely against Smith. As explained *infra,* they are totally without merit, and the Court has granted summary judgment dismissing them.

the Arabic ethnicity of the plaintiffs is and was a relevant factor in the Fourth Amendment analysis." Tr. of Oral Argument, July 18, 2008, at 13.

The Court rejects the Government's contention that plaintiffs' ethnicity can be a factor in determining the validity of plaintiffs' seizures and detentions, and holds that plaintiffs' *Bivens* and FTCA claims survive summary judgment. Further, with respect to the *Bivens* claims, the Court holds that summary judgment cannot be granted on Smith and Plunkett's qualified-immunity defense, since there are factual issues to be resolved at a trial.

## STATEMENT OF THE CASE

### Facts

The facts are taken primarily from the Government's Rule 56.1 Statement of Undisputed Material Facts (hereinafter "Gov't Stat."), which consists largely of *plaintiffs' own* deposition testimony describing the relevant events. The Government admits the contents of its Rule 56.1 Statement to be true *only* for the limited purpose of its motion for summary judgment, and has "reserve[d] the right to dispute the facts" in the event of a trial. Gov't Stat. at 1, n.1; *see Integrated Waste Servs., Inc. v. Akzo Nobel Salt, Inc.*, 113 F.3d 296, 298 n.4 (2d Cir. 1996) ("[Defendant] concedes negligence for purposes of its summary judgment motion, while preserving its right to challenge negligence should the case go to trial.").[3] In footnotes, the Court indicates where plaintiffs, in their responsive Rule 56.1

---

[3]For this reason, the Court will not consider searching the record and *sua sponte* granting summary judgment in favor of plaintiffs with respect to any of their claims. *See Lone Wolf McQuade Assocs. v. CBS Inc.*, 961 F. Supp. 587, 599 (S.D.N.Y. 1997).

Statement (hereinafter "Pl. Stat."), take exception to the facts as characterized in the Government's Rule 56.1 Statement.

The court also takes information from (1) Smith and Plunkett's contemporaneous incident report; (2) Plunkett's contemporaneous summary of his interrogation of Elmasry; (3) Smith's contemporaneous summary of his interrogation of Farag; and (4) the declaration of Dennis Walsh, the pilot of Flight 236 – all of which the Government submitted in support of its summary-judgment motion.

## I. Events at San Diego International Airport

Farag and Elmasry, long-time friends, were flying from San Diego International Airport to JFK after vacationing in California. Both were born in Egypt, but Farag, 36, had moved to the United States in 1971 at age five and later became an American citizen. He was a retired New York City police officer, and was then employed by the United States Bureau of Prisons as a corrections officer. Elmasry, 37, was an Egyptian citizen; he was employed in Egypt by General Electric as an area sales manager for its Africa-East Mediterranean region, and had a valid United States visa.

After plaintiffs boarded the plane, they took neighboring but non-adjacent seats: Farag was seated in 17E, a middle seat on the right side of the aisle, and Elmasry was seated in 18A, a window seat on the left side, one row behind Farag. Smith and Plunkett were seated nearby: Smith was in seat 17A, a window seat immediately in front of Elmasry and in the same row as Farag, but on the other side of the aisle, and Plunkett was one seat away in 17C, the aisle seat. The seat between Smith and Plunkett, 17B, was

vacant.  Plaintiffs did not know that Smith and Plunkett were counterterrorism agents.

Plaintiffs placed their carry-on luggage in the overhead compartments above their respective seats, and, once seated, "talked to each other, over the heads of the other passengers, in a mixture of Arabic and English." Gov't Stat. ¶ 33.[4]  While the plane was at the gate, Elmasry entered the aisle and asked Plunkett if he would be willing to shift over one seat to 17B, the center seat, and let Elmasry sit in 17C, the aisle seat.[5]  Plunkett declined.

After Elmasry left his seat to speak to Plunkett, a female passenger seated next to Elmasry in 18B had stretched her legs across Elmasry's seat. After Plunkett refused Elmasry's request, Elmasry, rather than returning to his seat, asked Smith and Plunkett if he could sit *between* them, in the vacant seat 17B.  Smith and Plunkett agreed.  According to the agents' contemporaneous incident report, Plunkett thought it "unusual that anyone would move from an exit row window seat to an exit row middle seat . . . in between two large men," Incident Report, Ex. C to Perry Decl., at 2, but the report also acknowledges that  Elmasry had explained that he wanted to change seats "so he could be 'close to [his] friend[.]'"  *Id.* at 1.[6]

_____

[4]All passages from the Government's Rule 56.1 statement cite plaintiffs' depositions, unless otherwise noted.

[5]Elmasry explained in his deposition that he had hoped to first move to 17C, the aisle seat where Plunkett was sitting, and then ask the man across the aisle in 17D (i.e., next to Farag) if he would switch seats either with Elmasry or with Farag, leaving Farag and Elmasry in adjacent seats (although, in the latter case, separated by the aisle).

[6]Elmasry explained in his deposition that he was embarrassed to ask the woman, whom he described as elderly, to move her legs so that he could reclaim his seat.

Even after Elmasry moved to 17B, he and Farag still "were only able to converse with each other . . . over the heads of other passengers." Gov't Stat. ¶ 39 (quoting Compl. ¶ 30). Once again, they spoke "in a mixture of Arabic and English," *id.*, but were now "speaking loudly." *Id.*[7] At some unspecified point, Farag fell asleep.

## II. Events During the Flight

As the plane took off – as well as at various other times throughout the flight – Smith and Plunkett noticed Elmasry looking at his watch. According to the two agents, Elmasry appeared to be "timing" various events during the flight, such as takeoff, attainment of level flight, and the commencement of the meal service. *Id.* ¶ 43.[8]

About half an hour after takeoff, Elmasry left his seat to go to the lavatory at the rear of the plane. On his way back, Elmasry spoke with a flight attendant, asking if

_____

[7]Although the Government's characterization of plaintiffs' speech as "loud[]" is taken from plaintiffs' complaint, plaintiffs now dispute that they spoke "loudly[,]" claiming instead that "they just spoke at a somewhat higher volume than usual." Pl. Stat. ¶ 4. In any event, plaintiffs argue that the agents should have understood that the only reason why plaintiffs were raising their voices was "because even after Elmasry moved to the empty middle seat, he and Farag were still a few seats apart from each other so they would need to raise their voices in order to hear each other." *Id.*

[8]In plaintiffs' Rule 56.1 Statement, they take issue with the agents' "timing" allegations, asserting that "Defendants unreasonably portray[] Elmasry looking at his watch as him appearing to time different parts of the flight . . . ." Pl. Stat. ¶ 6. Plaintiffs note that "[d]efendants don't allege that Elmasry recorded the times anywhere, which someone would have to do to remember the timing of different [events]." *Id.* Plaintiffs also explain that the reason why Elmasry looked at his watch when the plane took off was merely to see if the plane was leaving on schedule.

there were two adjacent empty seats to which he and Farag might move.[9]  Elmasry then returned to the seat between Smith and Plunkett and fell asleep.  He awoke during the meal service; Farag had already awakened some time earlier.  Once the meal had been served and plaintiffs had eaten, the flight attendant with whom Elmasry had spoken approached him in his seat between the agents and "told him that there were two empty seats at the back of the plane for him and Farag."  *Id.* ¶ 47.  Elmasry entered the aisle, leaned over to Farag, and spoke a "very short sentence" in a mixture of Arabic and English.  *Id.*  Plaintiffs moved to the two seats at the rear of the plane but did not take their carry-on bags with them.[10]

About an hour and a half before landing, Smith and Plunkett decided that Farag and Elmasry should be detained and questioned when the plane landed because the agents were concerned that plaintiffs "may be conducting [terrorist] surveillance[] or probing operations."  *Id.* ¶ 63 (quoting Incident Report, Ex. C to Perry Decl., at 2).[11]

[9]This conversation occurred at approximately row 25.  Although the Government's Rule 56.1 Statement adopts Elmasry's description of this conversation with the flight attendant, it is not clear from the Government's statement whether the agents, seated in row 17, could hear it.

[10]Farag explained that he and Elmasry did not take their carry-on bags because they planned to return to the front of the aircraft before landing so that they "would [not] be the last ones off the plane."  Farag Dep. I at 252:9-13.

[11]According to the Government's Rule 56.1 Statement, "Detective Smith and Agent Plunkett . . . wrote [in their Incident Report] that they decided to detain and question Plaintiffs after the plane landed at JFK Airport . . . ."  Gov't Stat. ¶ 63.  This ambiguous statement could be interpreted to mean (1) that *the decision was made* after the plane landed at JFK, or (2) that the decision was made, at an unspecified earlier point, *to detain plaintiffs* after the plane landed at JFK.  Captain Walsh's declaration makes clear that the latter interpretation is the correct one, and that the decision was

Plunkett explained to the flight's captain that "two men of [M]iddle [E]astern descent" were "acting suspicious" in that "they were talking back and forth in Arabic" and that "one of them got up from his assigned seat and sat between [Smith and Plunkett]." Walsh Decl., Ex. E to Occhiogrosso Aff., at 1. Although the agents "did not feel that these two individuals posed an immediate threat to the flight," they nonetheless asked the captain to "request[] a team of officers . . . to meet the approaching aircraft at the gate . . . and [to inform them] that two [M]iddle [E]astern males will be stopped and questioned about their actions during the flight." Incident Report, Ex. C to Perry Decl., at 2.

Elmasry and Farag remained at the back of the plane until shortly before landing. After an announcement was made that landing was imminent and the passengers were told to fasten their seat belts, Elmasry returned to seat 17B, between Smith and Plunkett, where he had previously been sitting; Farag sat in Elmasry's original seat, 18A, directly behind Smith.[12]

Once the plane landed, at approximately 11:30 p.m. local time, Smith and Plunkett again saw Elmasry check his watch. The plane took between thirty and forty-five minutes to reach the gate. At some point during that interval, Elmasry took out his cellular

___

made "[a]bout an hour and a half before getting to New York . . . ." Walsh Decl., Ex. E to Occhiogrosso Aff., at 1.

[12]Farag explained in his deposition that the reason he sat in Elmasry's original seat, rather than in *his own* original seat, is that another passenger had taken that seat while he and Farag had been in the back of the plane. Plaintiffs claim in their Rule 56.1 Statement that the agents "would have seen that another passenger was sitting in Farag's seat and should have realized that was why Farag sat in a different seat." Pl. Stat. ¶ 7.

phone and paged through his address book, deleting five or six entries.[13]  Meanwhile,

Farag made two or three "short" calls on his cellular phone; he spoke in English.  Gov't

Stat. ¶ 57.

While the plane was taxiing, Smith asked Elmasry, who was seated beside

him, where he was from and what he did for a living.  Elmasry truthfully told Smith that

he was from Egypt, that he was employed by General Electric, and that he was in the

United States on vacation.  Elmasry then asked Smith what *he* did for a living; Smith falsely

told Elmasry that he worked for the delivery company DHL.  Elmasry remarked that

Smith's job must involve a lot of traveling; Smith said that it did.  Elmasry then told Smith

that in his own job, he, too, "[was] always traveling." *Id.* ¶ 58.

## III.  Events at JFK

Once the plane reached the gate, Plunkett went to the front of the aircraft;

soon thereafter, the passengers began deplaning.  According to the agents, "Plaintiffs were

detained as they exited the aircraft." *Id.* ¶ 63 (citing Incident Report, Ex. C to Perry Decl.,

at 3.).  As Elmasry recalled events, he retrieved his carry-on bag from the overhead bin and

began to deplane, with Farag close behind.  Smith and Plunkett had already deplaned.

Upon exiting the aircraft, Elmasry saw uniformed police officers standing in the jetway.

Plunkett was signaling toward him and Farag.  One of the uniformed officers took hold of

---

[13]In his deposition, Elmasry said that he was simply bored as a result of the inordinate amount of time the plane was taking to reach the gate; therefore, he decided to delete several telephone numbers belonging to individuals he had met during his vacation but did not plan to see again.

Elmasry and escorted him into the terminal; another officer did the same to Farag. No one pointed a gun at either plaintiff.

According to Farag, on the other hand, after the passengers had begun deplaning, five or six plainclothes Port Authority police officers boarded and identified themselves, speaking in a "conversational tone"; their badges were displayed on their jacket pockets. *Id.* ¶ 62.[14] The Port Authority officers seized plaintiffs at their seats, grabbing them by their arms; they did not have their guns drawn and did not tell plaintiffs that they were under arrest. The officers asked for plaintiffs' carry-on bags and escorted them off the aircraft while Smith and Plunkett "were standing there." *Id.* Farag does not recall seeing any uniformed police officers until plaintiffs entered the terminal.

Upon entering the terminal, plaintiffs saw a team of uniformed Port Authority police officers (Elmasry remembers ten; Farag, fifteen to twenty) "in SWAT gear"; some had police dogs. *Id.* ¶ 64. The officers were "carrying shotguns," but no officer pointed a gun at either plaintiff. *Id.* According to Farag, these officers formed a "perimeter" around the gate area. *Id.* Farag and Elmasry were separated and taken to locations thirty-five to forty feet apart. Each was accompanied by two officers (Farag by Smith and Plunkett, and Elmasry by two Port Authority officers); a fifth officer walked back and forth between Farag and Elmasry. While at these two locations, Farag and

---

[14]The Port Authority defendants, before they were dismissed from the case, disputed Farag's claim that Port Authority officers boarded the aircraft.

Elmasry were ordered to raise their hands and were frisked.[15]

Smith then began questioning Farag, who provided Smith with identification and told him truthfully that he was a retired New York City police officer and a federal corrections officer employed by the Bureau of Prisons.[16] Farag mentioned to Smith that "after 9/11, when the CIA had c[o]me into the Federal Bureau of Prisons, [Farag's] supervisors had asked [him] to translate documents, to translate tapes . . . ." *Id.* ¶ 69. He also told Smith that he had "had guns pointed at [him] as a police officer" with the NYPD. *Id.* Farag explained that during this conversation with Smith he was "[s]cared, frightened, paranoid, [and his] mind was racing[,]" that he was "jittery" and "shaking" and "[his] speech was not calm[,]" and that he was in "a complete sta[t]e of shock" and was "totally confused." *Id.* Elmasry, who could see Farag at that time, observed that Farag was "nervous[,]" that he looked agitated and jumpy, and that Farag raised his voice at times. *Id.* ¶ 68.[17]

"At some point thereafter," the police officers handcuffed Farag and then Elmasry. *Id.* Although Elmasry recalls being handcuffed "approximately fifteen minutes

_____

[15]According to plaintiffs' Rule 56.1 Statement, this all happened in full view of their fellow passengers; Farag had asked a Port Authority officer to hide his face from the onlookers, but the officer refused.

[16]According to Farag's deposition, he also gave Smith his federal employee tax ID number.

[17]In his deposition, Elmasry explained that although Farag appeared nervous and agitated, he did "not [act] in a violent way," and that although he raised his voice somewhat, he did not yell. Elmasry Dep. at 145:4-14.

after being brought into the terminal," *id.,* Plunkett, in his contemporaneous report, stated that plaintiffs were "handcuffed upon exiting the aircraft." Plunkett Report, Ex. A to Perry Decl., at 1.

During this time in the terminal, none of the officers pointed their guns at plaintiffs, struck them, or called them any derogatory names. Farag testified that "all of the law enforcement officers who were on the scene acted in a professional manner." Gov't Stat. ¶ 73.

## IV. Events at the Port Authority Police Station

After they were handcuffed, Farag and Elmasry were taken in separate police cars to a Port Authority police station between five and fifteen minutes away. Upon their arrival, they were placed in separate holding cells. Elmasry's handcuffs were removed as soon as he was placed in the cell; Farag spent "a little while" inside his cell before his handcuffs were removed. *Id.* ¶ 75.

After thirty to forty-five minutes in his cell, Elmasry was taken to an interrogation room for questioning by Plunkett and a plainclothes Port Authority officer. The questioning lasted approximately two-and-a-half to three hours. "[T]hey would question him for fifteen to twenty minutes, then leave the room for twenty minutes, then question him again, then leave the room, again, several times[,]" *id.* ¶ 78; "[o]ne time they questioned him for forty-five minutes to one hour." *Id.* The Port Authority officer spoke "loudly" and in an "aggressive" manner. *Id.* ¶ 79. Elmasry was asked not just about his relationship with Farag, his seat changes, his glancing at his watch and his deletion of

numbers from his cellular phone, but also about his religious beliefs, items in his luggage, his employment with General Electric, the stamps in his passport and various names and notes in his address book. Plunkett also viewed photographs stored in Elmasry's digital camera. At the end of the questioning, Plunkett told Elmasry that he had not been arrested, but merely "stop[ped] for interrogation." *Id.* ¶ 84. Plunkett's contemporaneous notes state that Elmasry was "cooperative during the entire interview and showed no signs of hostility." Plunkett Report, Ex. A to Perry Decl., at 1.

Farag remained in his cell for more than an hour. While he waited, Farag asked Smith twice if he could call a lawyer; "Smith said Farag could . . . if he wanted to, but did not arrange for him to do so." Gov't Stat. ¶ 93. Farag was then removed from his cell; he did not ask again to contact a lawyer. He was taken to an interrogation room where he was questioned by Smith for about two hours. He was asked not just about his relationship with Elmasry, their vacation together, and his seat changes on the airplane, but also about his religious practices, his employment background, whether he had any connections with anti-American groups, and whether he "c[ould] get close to the terrorists that [he] translate[d] for at the Bureau of Prisons." *Id.* ¶¶ 89, 94. Smith also examined photographs on Farag's digital camera.[18]

In their report, the agents wrote that "during their questioning of Farag and Elmasry" they requested various background checks from the FBI, the CIA and the Bureau

---

[18]According to Farag's deposition, at some point during the interrogation, Smith told Farag that he "didn't want to [have to] go back and pick up body parts . . . ." Farag Dep. II at 33:17.

of Immigration and Customs Enforcement; these background checks confirmed that Farag had indeed been a New York City police officer and was then employed as a corrections officer with the Federal Bureau of Prisons. *Id.* ¶ 95. The record does not reflect whether these requests were made while plaintiffs were being questioned at the terminal or at some specific time during their jailhouse interrogation; nor does it reflect how long it took to get responses.

Farag and Elmasry were released at approximately 4:00 a.m., about four and a half hours after they had been taken off the plane. At no point during their detentions or interrogations did any officer strike or threaten them; nor did any officer use profanity or ethnic slurs.

### The Commencement of the Litigation

Before initiating this action, plaintiffs complied with the administrative prerequisites for suing the United States under the FTCA by duly filing written notices of claim. *See* 28 U.S.C. § 2401(b). In addition to the United States and Smith, plaintiffs' complaint named as defendants: (1) the City of New York; (2) the Port Authority of New York and New Jersey; (3) seven Port Authority officers; and (4) "FBI Agent 'John Doe,'" who was in fact Plunkett. Plunkett was not initially served with process.

Thereafter, the United States and Smith certified that Smith, although a New York City police detective, " was acting . . . as a deputized federal employee of the Federal Bureau of Investigation's Joint Terrorism Task Force . . . at the time of the conduct alleged in the complaint." Cert. of Scope of Employment for Thomas P. Smith at 1. Therefore,

plaintiffs agreed to the dismissal of their claims against the City of New York. Additionally, the Government stipulated that the actions of the various Port Authority defendants were taken solely at Smith and Plunkett's direction; consequently, plaintiffs agreed to the dismissal of their claims against the Port Authority and its officers.

Plaintiffs ultimately did serve process on Plunkett; he has appeared and is represented by the U.S. Attorney's Office, as are Smith and the United States.[19] The Court *sua sponte* has amended the caption of the complaint to name the United States, Plunkett and Smith as the sole defendants.

### The Government's Justification for Its Conduct

The Government lists the following actions of Farag and Elmasry on the aircraft, which, they argue, supported the agents' "concern that [plaintiffs] may [have been] conducting [terrorist] surveillance or probing operations," Gov't Br. at 5,[20] and justified the agents' seizures, detentions, and interrogations of plaintiffs:

- At the beginning of the flight, despite sitting on opposite sides of the aisle, plaintiffs spoke to each other over the heads of other passengers in a mixture of Arabic and English;

---

[19]From the inception of the case in 2005 until this past August, Smith and the United States were represented by Assistant U.S. Attorney Steven M. Warshawsky, who is no longer with the office. Prior to Plunkett's appearance in October 2008, Mr. Warshawsky was succeeded by Assistant U.S. Attorney Scott R. Landau, who now represents all three remaining defendants.

[20]In particular, the Government argues that "there was probable cause to believe that Plaintiffs were violating the Destruction of Aircraft Act, 18 U.S.C. § 32, and the federal conspiracy statute, 18 U.S.C. § 371, both of which have been upheld by the Second Circuit as providing legitimate grounds for prosecuting potential terrorist plots against United States-flag aircraft." Gov't Br. at 25 (citing *United States v. Yousef*, 327 F.3d 56, 86-88 (2d Cir. 2003)).

16

- Elmasry made an allegedly "unusual" initial seat change "from a window seat . . . to a middle seat . . . between two other male passengers";

- After Elmasry changed seats, he and Farag talked to each other "loudly" over the heads of other passengers in a mixture of Arabic and English;

- Elmasry looked at his watch when the plane took off, when the plane landed, and at other points during the flight;

- After the meal service, Elmasry "got out of his seat . . . , went into the aisle, leaned over to Farag, and spoke a 'very short sentence' to Farag in a mixture of Arabic and English";

- Immediately thereafter, plaintiffs moved together to the back of the plane, and did not take their carry-on luggage with them;

- Plaintiffs got up to return to the front of the cabin at the very end of the flight, after the "fasten seatbelt" indicator was lit;

- Upon returning to the front of the plane, Farag did not sit in his original seat (17E), but rather, in Elmasry's original seat (18A), which was located directly behind Smith;

- After the plane landed, Elmasry took out his cellular phone and deleted five or six numbers;

- While the plane was taxiing to the gate, Elmasry told Smith that "he is from Egypt, that he works for GE, and that '[his] work is always traveling.'"

*See* Gov't Br. at 14-16.

The Government lists the following events that took place in the terminal at

JFK, after plaintiffs were first detained, as further support for the agents' actions:

- Farag told Smith  that "after 9/11, when the CIA had c[o]me into the Federal Bureau of Prisons, my supervisors had asked me to translate

17

documents, to translate tapes, [and] in fact I did translate tapes";

- Farag told Smith that "I had guns pointed at me as a police officer";

- While Farag was telling these things to Smith, Farag was "jittery" and "shaking" and "[his] speech was not calm." He appeared "nervous" and seemed "jumpy and agitated," and he raised his voice.

*See* Gov't Br. at 25-26.

## DISCUSSION

### Summary Judgment Standards

A district court must grant summary judgment "whenever it determines that there is no genuine issue of material fact to be tried." *Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir. 2003) (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court must "resolve all ambiguities and draw all factual inferences in favor of the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 255).

In a *Bivens* action, "it would usually be a jury's task to decide whether a detention amounted to a *de facto* arrest, since '[t]he issue of precisely when an arrest takes place is a question of fact.'" *Oliveira v. Mayer*, 23 F.3d 642, 645 (2d Cir. 1994) (quoting *Posr v. Doherty*, 944 F.2d 91, 99 (2d Cir. 1991)). Where, however, "there can be but one conclusion as to the verdict that reasonable [jurors] could have reached" as to the existence of a *de facto* arrest, it is appropriate for a court to decide the question on summary judgment. *Id.* (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 359 (2d Cir. 1992))

(alteration in *Oliveira*).

"In order to defeat [a] claim of false arrest on a motion for summary judgment, [the movant-defendant must] show that probable cause existed and that there was 'no dispute as to the pertinent events and the knowledge of the officers.'" *Codling v. City of New York*, 68 Fed. Appx. 227, 228-29 (2d Cir. 2003) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)); *see also Walczyk v. Rio*, 496 F.3d 139, 158 (2d Cir. 2007) ("[W]here there is no [material] dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court." (citations omitted)).

Finally, though the existence of qualified immunity "ordinarily should be decided by the court long before trial[,]" *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (citation omitted), "that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration [of the underlying facts] is normally required." *Oliveira*, 23 F.3d at 649 (citations omitted).

## *Bivens* and FTCA Claims

## I. Analytical Framework

## A. Bivens *Claims*

"[W]here an individual has been deprived of a constitutional right by a federal agent acting under color of federal authority, the individual may bring a so-called *Bivens* action for damages against that federal agent in an individual capacity . . . ." *Lombardi v. Whitman*, 485 F.3d 73, 78 (2d Cir. 2007) (internal quotation marks and citation

omitted).[21]  Plaintiffs seek damages under *Bivens* for what they claim were warrantless

arrests without probable cause in violation of the Fourth Amendment.[22]

Plaintiffs' Fourth Amendment rights would, of course, have been violated

if they were arrested without "probable cause to believe a crime ha[d] been or [was] being

committed."  *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008) (citations

omitted).  But under *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny, Smith and Plunkett

could lawfully have conducted a limited detention with only "a reasonable suspicion

supported by articulable facts that criminal activity 'may be afoot[.]'"  *United States v.*

*Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30); *see also United States v. McCargo*,

---

[21]Plaintiffs' complaint styles their constitutional claims against Smith as actions
under 42 U.S.C. § 1983, not *Bivens*.  However, § 1983 applies only to officials acting
"under color of *state* law . . . ."  *Zapata v. City of New York*, 502 F.3d 192, 194 n.2 (2d Cir.
2007) (emphasis added); *see also Ellis v. Blum*, 643 F.2d 68, 83 (2d Cir. 1981).  Because
Smith was a deputized special agent acting under color of *federal* law at the time of these
events,  § 1983 is inapplicable.  *See id.* ("[T]he state officials were not acting under color
of state law, [but rather, under federal law,] with the result that § 1983 is unavailable.").
Nevertheless, because of the close analogy between § 1983 claims and *Bivens* claims, *see*
*Chin v. Bowen*, 833 F.2d 21, 23-24 (2d Cir. 1987), the Court may - and does - construe
plaintiffs' § 1983 claims as *Bivens* claims. *See, e.g., Robinson v. Overseas Military Sales*
*Corp.*, 21 F.3d 502, 510 (2d Cir. 1994) (approving of district court treating § 1983 claims
as *Bivens* claims).

[22]In addition to alleging that Smith and Plunkett violated Plaintiffs' Fourth
Amendment rights, plaintiffs added that the agents' actions also violated their Fifth
Amendment right "not to be denied their liberty without due process of law."  Compl.
¶ 63, 73.  However, plaintiffs' Fourth Amendment and Fifth Amendment due-process
claims are both premised on the same factual allegations of false arrest and false
imprisonment.  Consequently, the Fourth Amendment's specific guarantee of freedom
from unreasonable seizures, not the Fifth Amendment's general guarantee of due
process, provides the appropriate framework of analysis. *See Gerstein v. Pugh*, 420 U.S.
103, 125 n.27 (1975) ("The Fourth Amendment was tailored explicitly for the criminal
justice system, and it[] . . . always has been thought to define the 'process that is due' for
seizures of person or property in criminal cases . . . .").

464 F.3d 192, 197 (2d Cir. 2006) (investigative detention under *Terry* "requires considerably less of a showing than probable cause." (citation omitted)). However, even under the "reasonable suspicion" standard, "[an] officer . . . must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 27).

Where the reasonable suspicion standard is met, "[t]he scope of a *Terry* stop must . . . be reasonable . . . ." *McCargo*, 464 F.3d at 198. Although "the methods police used need not be the least intrusive available[,] . . . the police [may not] act[] unreasonably in failing to recognize or to pursue [less-intrusive means]." *Id.* (internal quotation marks and citation omitted); *see also Gilles v. Repicky*, 511 F.3d 239 (2d Cir. 2007) ("[T]he investigative methods employed should be the least intrusive means *reasonably* available to verify or dispel the officer's suspicion in a short period of time." (citation omitted; emphasis added). Thus, even assuming *arguendo* that Smith and Plunkett had reasonable suspicion to make a *Terry* stop, if that stop "continue[d] too long or bec[ame] unreasonably intrusive, it . . . ripen[ed] into a *de facto* arrest that [required] probable cause." *United States v. Glover*, 957 F.2d 1004, 1011 (2d Cir. 1992) (citations omitted).

**B.  *FTCA Claims***

Under the FTCA, the United States is liable in money damages for a federal employee's common-law torts "in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674. Plaintiffs' FTCA claims are based upon their contentions that Smith and Plunkett committed the common-law torts

of false arrest and false imprisonment.[23] In suits under the FTCA, "the court [is] to apply the substantive law of the place where the events occurred" - here, New York. *Castro v. United States*, 34 F.3d 106, 110 (2d Cir. 1994).

"[A] plaintiff will prevail on a claim of false arrest under New York law if he can show that the arrest was . . . not based on probable cause . . . ." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (citing *Broughton v. State*, 37 N.Y.2d 451, 456-57 (1975)).[24] The probable-cause standard under New York state law is functionally identical to the analogous standard under the federal Constitution. *See Weyant*, 101 F.3d at 852. Consequently, the same probable-cause evaluation that drives the Court's analysis of plaintiffs' *Bivens* claims against Smith and Plunkett also drives the Court's analysis of plaintiffs' common-law false-arrest claims against the United States pursuant to the FTCA.

**C. *Qualified Immunity***

Even if the Court determines that plaintiffs were arrested without probable cause or subjected to a *Terry* stop without reasonable suspicion, Smith and Plunkett may be protected from *Bivens* liability by the defense of qualified immunity, which "shields government officials performing discretionary functions 'from liability for civil damages

---

[23]The torts of false arrest and false imprisonment are identical under New York law. *See Posr*, 944 F.2d at 96 ("In New York, the tort of false arrest is synonymous with that of false imprisonment.") (citing *Jacques v. Sears, Roebuck & Co.*, 30 N.Y.2d 466, 473 (1972)). Therefore, the Court will refer to them jointly as "false arrest."

[24]The tort of false arrest requires three additional elements not in dispute: "(1) [that] the defendant intended to confine [the plaintiff], (2) [that] the plaintiff was conscious of the confinement, [and] (3) [that] the plaintiff did not consent to the confinement . . . ." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (quoting *Broughton*, 37 N.Y.2d at 457).

insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The United States, by contrast, may not assert qualified immunity as a defense to plaintiffs' FTCA claim.  *See Castro*, 34 F.3d at 111 ("In a suit against the United States under the FTCA . . . qualified immunity will not immunize the United States from liability . . . ." (citing *Rivera v. United States*, 928 F.2d 592, 608-09 (2d Cir. 1991))); *Li v. Aponte*, No. 05 Civ. 6237(NRB), 2008 WL 4308127, at *7 n.42 (S.D.N.Y. Sept. 16, 2008) (holding qualified immunity defense unavailable to the United States in FTCA action).

## II. Analysis

### A. *Were Plaintiffs Arrested?*

Preliminarily, a plaintiff asserting a violation of the Fourth Amendment "must . . . show some deprivation of liberty consistent with the concept of 'seizure.'" *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995) (footnote omitted).  There is no question but that plaintiffs were subjected to a "seizure" cognizable under the Fourth Amendment, since Smith, Plunkett and the Port Authority officers (acting under Smith and Plunkett's authorization) "by means of physical force or show of authority . . . restrained the liberty" of plaintiffs, *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Terry*, 392 U.S. at 19 n.16), and because under these circumstances, "a reasonable person would [not] feel free to decline the officers' requests or otherwise terminate the encounter . . . ." *Id.* at 436.

Nor can there be a serious question but that the plaintiffs were subject to a

*de facto* arrest, notwithstanding the Government's contention that the entire episode was nothing more than a *Terry* stop. Each of three sets of factors standing alone – not to mention collectively – sufficed to convert the seizures into *de facto* arrests: (1) the officers' show of force and restraint of plaintiffs' movement at the terminal; (2) the transportation of plaintiffs to the police station, the confinement of plaintiffs in jail cells, and the custodial interrogation of plaintiffs; and (3) the duration of plaintiffs' confinements and interrogations. The Court considers each in turn.

**1. Show of Force and Restraint of Movement at the Terminal**

The Second Circuit has identified the following factors to be considered in determining when a seizure ripens into a *de facto* arrest:

> the amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such facts as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.

*United States v. Vargas,* 369 F.3d 98, 101 (2d Cir. 2004) (quoting *United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993)) (internal quotation marks omitted). Although "[s]tanding alone, no single factor would necessarily convert [a] detention from a *Terry* stop into a *de facto* arrest[,]" *Oliveira*, 23 F.3d at 646 – even if it be assumed that the initial seizures were valid *Terry* stops – the combination of these factors overwhelmingly compels the conclusion that plaintiffs were *de facto* arrested in the terminal.

As Smith and Plunkett wrote in their joint incident report, "[w]hen [Farag

and Elmasry] exited the aircraft, they were stopped by members of the Port Authority Police Department, separated, handcuffed, and taken to a secure area within the terminal at J.F.K. Airport."[25]  Incident Report, Ex. C to Perry Decl., at 3.  According to Farag, six plainclothes police officers with badges on their jackets seized plaintiffs at their seats, grabbed them by their arms, and escorted them off the plane.  According to Elmasry, plaintiffs were met by uniformed officers in the plane's jetway; the officers took hold of them and brought them into the terminal.  As recounted by both plaintiffs, upon entering the terminal they were met by police dogs and at least ten (and as many as twenty) uniformed police officers in SWAT gear carrying shotguns; taken to separate locations about thirty-five to forty-feet apart, each accompanied by two police officers; ordered to raise their hands; and frisked.  And after Farag was questioned about his past employment with the NYPD and his present employment with the Bureau of Prisons, plaintiffs were handcuffed.

This show of force and police behavior is totally inconsistent with the notion of a *Terry* stop.  In *Oliveira,* the Second Circuit held as a matter of law that a detention was an arrest, not a *Terry* stop, where, *inter alia,* "the plaintiffs were boxed-in by six police vehicles and outnumbered two-to-one by officers with their guns drawn or at the ready," were forcefully ordered from their vehicles and handcuffed, and were then "placed in separate police cruisers and questioned . . . ."  23 F.3d at 646 (internal citations omitted).

---

[25]According to Elmasry, the handcuffing of both plaintiffs took place "approximately fifteen minutes after being brought into the terminal." Gov't Stat. ¶ 68.

Many aspects of the seizure in *Oliveira* also describe the seizures that occurred here. *Accord United States v. Novak*, 870 F.2d 1345, 1351-53 (7th Cir. 1989) (*de facto* arrest occurred where two suspects "were suddenly surrounded in the airport's enclosed walkway by . . . six to nine law enforcement officers, at least one of whom drew a gun"); *cf. United States v. Tehrani,* 49 F.3d 54, 61 (2d Cir. 1995) (no *de facto* arrest where "no force was required and none was used[;] [t]here were only two government agents involved and, at the point at which each defendant was asked to retire to a private office, only one agent was present"); *United States v. Hernandez*, 219 F. Supp. 2d 556, 562 (S.D.N.Y. 2002) (no *de facto* arrest where, *inter alia*, "only three DEA agents were present during the stop of the two defendants" and handcuffs were not used until after probable cause to arrest arose). The compendium of cases cited in *Oliveira*, in which ostensible *Terry* stops crossed the line and became *de facto* arrests under circumstances less intrusive in many respects than those of the present case, reinforces the conclusion that plaintiffs were under arrest in the terminal. *See Oliveira*, 23 F.3d at 646-647 (collecting cases).

Notably, this is not a case where a significant show of force was justified by concerns for the immediate safety of bystanders or the officers. *See United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990) ("A law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders . . . ." (citations omitted)). Indeed, the circuit court in *Oliveira* explained that "whenever this Court and other circuits have found an intrusive detention to be only a *Terry* stop, the police have always had a

reasonable basis to believe the suspect was armed or otherwise dangerous." 23 F.3d at 646 (citations omitted). That was not the case here: plaintiffs had to have passed through airport security in San Diego, and Smith and Plunkett wrote in their contemporaneous report that they "did not feel that [plaintiffs] posed an immediate threat . . . ." Incident Report, Ex. C to Perry Decl., at 2. Nor are there any allegations that Farag or Elmasry threatened anyone or were uncooperative with the authorities – they readily answered all questions asked of them.[26]

In sum, as in *Oliveira*, "[w]hen [the Court] consider[s] (1) the numerous oppressive elements of the encounter between the police and the plaintiffs, (2) the limited evidence that there was a crime, and (3) the absence of any indication the plaintiffs were armed or dangerous, [the Court] must conclude, as a matter of law," if the plaintiffs' version of events is established at trial, "that the plaintiffs were subjected to a degree of restraint [that] was too intrusive to be classified as an investigative detention." 23 F.3d at 647 (internal quotation marks and citation omitted).

## 2. The Jailings and Custodial Interrogations

The Supreme Court has acknowledged that "there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention, such as from an airport concourse to a more private

---

[26]Even if Farag did become somewhat agitated *after* being confronted with this overwhelming show of force, this could not have justified the initial show of force; moreover, according to Elmasry, Farag did "not [behave] in a violent way" and did not yell. Elmasry Dep. at 145:4-14. The Court must accept this version of the facts on summary judgment.

area." *Florida v. Royer*, 460 U.S. 491, 504 (1983) (plurality op.) (citation omitted).  However,

in *Royer*, the Supreme Court held that a *de facto* arrest occurred upon transferring the

suspect to an airport police interrogation room under circumstances *more* suggestive of

unlawful conduct than the circumstances in this case:

> The officers . . . informed [Royer] they were narcotics agents
> and had reason to believe that he was carrying illegal drugs.
> They requested him to accompany them to the police room
> [approximately forty feet away, adjacent to the concourse].
> Royer went with them. He found himself in a small room – a
> large closet – equipped with a desk and two chairs. He was
> alone with two police officers who again told him that they
> thought he was carrying narcotics . . . . What had begun as a
> consensual inquiry in a public place had escalated into an
> investigatory procedure in a police interrogation room, where
> the police . . . sought to confirm their suspicions. The officers
> had Royer's ticket, they had his identification, and they had
> seized his luggage. Royer was never informed that he was free
> to board his plane if he so chose, and he reasonably believed
> that he was being detained. At least as of that moment, any
> consensual aspects of the encounter had evaporated, and we
> cannot fault the Florida Court of Appeal for concluding that
> *Terry v. Ohio* and the cases following it did not justify the
> restraint to which Royer was then subjected. As a practical
> matter, Royer was under arrest.

*Id.* at 502-03.

Here, too, plaintiffs were removed from the airline concourse to a small,

enclosed space for interrogation purposes, but the enclosed space was literally a jail cell,

and the location in question was not forty feet away, as in *Royer*, but between five and

fifteen minutes away by car.  The transportation and confinement was thus far more

28

intrusive than what the Supreme Court in *Royer* held to constitute a *de facto* arrest.[27]

Indeed, the Supreme Court has squarely held that "transportation to and investigative detention at [a] station house" is not permissible incident to a *Terry* stop. *Hayes v. Florida*, 470 U.S. 811, 815 (1985); *see also Dunaway v. New York*, 442 U.S. 200, 212 (1979) (holding that a *de facto* arrest had occurred where "[p]etitioner was not questioned briefly where he was found . . . [but rather,] was taken . . . to a police car, transported to a police station, and placed in an interrogation room."). Thus, it has made pellucidly clear that "the line [between a *Terry* stop and an arrest] is crossed when the police . . . forcibly remove a person from . . . [a] place in which he is entitled to be and transport him to the police station, where he is detained, *although briefly*, for investigative purposes." *Hayes*, 470 U.S. at 816 (emphasis added). And, as discussed below, plaintiffs' station-house detention was anything but "brief[.]" *Id.*

Consequently, even assuming the agents' conduct in the terminal had fallen within the limits of *Terry*, the seizures unmistakably ripened into *de facto* arrests as soon as plaintiffs were transported to the station house.

## 3. Duration of the Detentions and Interrogations

As the Supreme Court has stated, "the brevity of the invasion of the

---

[27]As the Government points out, the Second Circuit has recently held that "in some circumstances, police may transport a suspect short distances in aid of a *Terry* stop." *McCargo*, 464 F.3d at 198. But the "transport[ation]" in that case consisted of taking a suspect to a fresh crime scene *only 200 feet away* for identification by the victim. *Id.* at 195-196. The cases cited by the Second Circuit in *McCargo* for support also involve transportation far less intrusive than, or different in character from, the relocation that occurred here.

individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive" as to qualify as a mere *Terry* stop. *United States v. Place*, 462 U.S. 696, 709 (1983); *see also United States v. Sharpe*, 470 U.S. 675, 685 (1985) ("Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop."); *Glover*, 957 F.2d at 1011 ("A critical factor in evaluating [whether a detention falls within the scope of *Terry*] is the length of the detention").

While the detention approved in *Terry* itself was a momentary frisk for weapons, *see* 392 U.S. at 29-30, the courts have subsequently sanctioned *Terry* stops of longer – but still limited – duration. *See, e.g.*, *Sharpe*, 470 U.S. at 687 (20 minutes); *Glover*, 957 F.2d at 1013 (30 minutes); *United States v. Sullivan*, 903 F.2d 1093, 1097-98 (7th Cir. 1990) (45 minutes)*; United States v. Borrero*, 770 F. Supp. 1178, 1189-91 (E.D. Mich.1991) (70 minutes); *cf. Place*, 462 U.S. at 709 ("[W]e have never approved a seizure of the person for the prolonged 90-minute period involved here and cannot do so on the facts presented by this case."); *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 828-29 (6th Cir. 2007) (holding that three-hour stop of terrorism suspects "far exceeded" the bounds of *Terry*).

Although "brevity" is an important consideration, it is a highly context-sensitive one. *See Place*, 462 U.S. at 709 n.10 (Under *Terry*, "authorities [may] graduate their responses to the demands of any particular situation."). Accordingly, the Supreme Court has refused to adopt any rigid temporal limitation. *See id.* at 709 ("[W]e decline to adopt any outside time limitation for a permissible *Terry* stop . . . ."); *Sharpe*, 470 U.S. at 685 ("Much as a 'bright line' rule would be desirable, . . . common sense and ordinary human experience

must govern over rigid criteria."). Rather, the permissible time frame depends on "the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Id.* (citations omitted). As the Supreme Court has explained:

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

*Id.* at 686 (citations omitted). Thus, where there has been "delay unnecessary to the legitimate investigation of the law enforcement officers[,]" the detention cannot be justified under *Terry,* and it becomes a *de facto* arrest. *Id.* at 687.

Using this context-sensitive, "common sense" approach, the Supreme Court has approved under special circumstances a detention far longer than the one at issue here. *See United States v. Montoya de Hernandez*, 473 U.S. 531 (1985). In that case, the high court sanctioned a detention of over sixteen hours to allow for a suspected drug-swallower who had refused to submit to an x-ray to excrete the contraband, noting that "alimentary canal smuggling cannot be detected in the amount of time in which other illegal activity may be investigated through brief *Terry*-type stops." 473 U.S. 531, 538 (1985). Although the court acknowledged that "[t]his length of time undoubtedly exceeds any other detention we have approved under reasonable suspicion," *Id.* at 543, it quite logically "refused to charge police with delays . . . attributable to the suspect's evasive actions." *Id.* (citation omitted);[28] *accord*

---

[28]The *Montoya de Hernandez* court also noted that these events occurred at the national border, where "the Fourth Amendment's balance of reasonableness is qualitatively different . . . than in the interior." *Id.* at 537-38.

*Sharpe*, 470 U.S. at 687-88 (upholding *Terry* stop where, *inter alia*, any "delay . . . was attributable almost entirely to the evasive actions of [the suspect] . . . .").

Here, by contrast, the Government has not met its summary-judgment burden of demonstrating that "the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes" justified the four-and-a-half hour duration of plaintiffs' detentions. *Sharpe*, 470 U.S. at 685.[29] Other than Farag's raising his voice in the airport terminal, plaintiffs were entirely cooperative with Smith and Plunkett's investigation. Moreover, upon being seized, plaintiffs promptly identified themselves and answered all of the agents' questions; Farag indicated that he was a federal employee and, according to his deposition, he provided his federal tax-identification number. The record does not suggest why the agents could not verify this information before over four hours had passed. *See Place*, 462 U.S. at 709 ("[T]he . . . agents knew the time of Place's scheduled arrival . . . , had ample time to arrange for their additional investigation at that location, and thereby could have minimized the intrusion on respondent's Fourth Amendment interests."); *cf. United States v. Hooper*, 935 F.2d 484, 496-97 (2d Cir. 1991) (upholding 30-minute detention under *Terry* where, under the circumstances, the officers "could not have

---

[29]Notably, this was not a "ticking-time-bomb" scenario in which law enforcement officials harbored a reasonable suspicion that an actual terrorist attack was imminent. Rather, Smith and Plunkett merely suspected that plaintiffs were conducting *surveillance* for an attack at some future time; in fact, the agents candidly stated that they "did not feel that [plaintiffs] posed an immediate threat to the flight . . . ." Incident Report, Ex. C to Perry Decl., at 2. Where an actual terrorist attack may be imminent, the weight of the law-enforcement interest at stake might well necessitate a different Fourth Amendment balancing – but such a scenario is not now before the Court.

been expected to . . . arrange for any [more expeditious] investigative technique"). Nor is there any suggestion why it was necessary for the agents to sequester plaintiffs for forty-five minutes to an hour in jail cells *before* commencing their station-house interrogations, and why it was thereafter necessary to subject plaintiffs to prolonged interrogations – two hours for Farag and up to three hours for Elmasry.

In sum, considering the record presently before the Court in respect to the show of force exhibited at the terminal, the transportation of plaintiffs to the station house for interrogation, and the duration of their detentions, the Government's position that the plaintiffs were never arrested, and that their detentions were mere *Terry* stops, is untenable. The question, then, is whether, viewing the facts in the light most favorable to the plaintiffs, the Government is entitled to summary judgment that there was probable cause for the arrests.

**B. *Was There Probable Cause for the Arrests?***

Probable cause to arrest exists "where the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Delossantos*, 536 F.3d at 158 (quoting *Walczyk*, 496 F.3d at 156). Only "those facts available to the officer at the time of the arrest and immediately before it" may be considered. *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996) (citation omitted). Moreover, "[p]robable cause is to be assessed on an objective basis[,]" *Zellner*, 494 F.3d at 369; thus, "[a]n arresting officer's state of mind (*except*

*for the facts that he knows*) is irrelevant . . . ." *Id.* The standard is a "fluid and contextual" one, requiring "examin[ation of] the totality of the circumstances of a given arrest." *Delossantos*, 536 F.3d at 159 (citations omitted).

"The Supreme Court has repeatedly stated that the probable-cause standard is 'a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* (quoting *Maryland v. Pringle*, 540 U.S. 366, 370 (2003)). A court must make its evaluation "from the perspective of a reasonable police officer in light of his training and experience." *Id.* (citation omitted).

## 1. Was There Probable Cause Based on Non-Ethnic Factors Alone?

The Government contends that even if the Court does not consider that plaintiffs were Arabs and that they were at times conversing in Arabic, the other factors relied upon by the Government constitute probable cause. The Court disagrees. The Government tacks together a number of benign circumstances in the apparent belief that their numerosity will carry the day. The Court acknowledges that the Second Circuit has cautioned district courts not to "engage[] in erroneous 'divide-and-conquer analysis'" by "declining to give weight to [individual] observation[s] 'that [were] by [themselves] readily susceptible to . . . innocent explanation[s.]'" *Id.* at 161 (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)); *accord Sokolow*, 490 U.S. at 9 ("Any one of these factors is . . . quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."). Yet, even viewing all of these circumstances as a whole, it cannot

rationally be held that if, hypothetically, the plaintiffs were two Caucasian traveling companions speaking French, or another non-Arabic language which the agents did not understand, "a person of reasonable caution" would have believed that they were engaged in terrorist surveillance. *Delossantos*, 536 F.3d at 158.

Principally, the Government relies on the agents' observations of plaintiffs' seat-changing and Elmasry's "timing" events with his watch. But the agents acknowledged in their incident report that they knew the plaintiffs were friends; quite logically, friends would want to sit as close to each other as possible, and they would also logically return to the vicinity of their original seats when the plane was landing to retrieve their carry-on luggage. As for Elmasry looking at his watch upon takeoff, landing, and at various other times during the flight, the proportion of airline passengers who do this is probably higher than the proportion who do not. *See United States v. Jones*, 149 F.3d 364, 369 (5th Cir. 1998) ("A factual condition which is consistent with [criminal activity] will not predicate reasonable suspicion, if that factual condition occurs even more frequently among the law abiding public . . . .").

The Government also argues that Elmasry's deletion of five or six telephone numbers from his cellular phone while he waited for the plane to reach the gate "could have been interpreted as destroying evidence[,]" Gov't Br. at 16. This conclusion, however, is utter speculation; the Government's Rule 56.1 Statement does not assert that *Elmasry* made any telephone calls during or after the flight, and the record gives no indication that Elmasry suspected he was about to be caught sufficient to imbue his acts with a suggestion

of guilt.  *Cf. United States v. Gomez*, 633 F.2d 999, 1002, 1008 (2d Cir. 1980) (holding that "sounds indicating destruction of evidence" *after* officers announced themselves and began to kick and bang on apartment door helped generate probable cause).

Most troubling, the heavy reliance which the Government places on the plaintiffs' speaking "loudly" to each other over the heads of other passengers and otherwise drawing attention to themselves is counterintuitive:  it simply makes no sense that if Elmasry were a terrorist on a surveillance mission, he would speak "loudly" across the aisle to his companion before takeoff, seek out and converse with the flight attendant, relocate to a seat "between two large men," or volunteer to one of those "large men" that he was from Egypt.  What terrorist engaged in surveillance activity would behave so conspicuously?  One would expect that such activity would be characterized by secrecy. *See Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988) ("As a corollary . . . of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause."); *cf. United States v. Lopez*, 482 F.3d 1067, 1075 (9th Cir. 2007) ("[W]e find that attendant facts gathered by the police tended to dissipate, rather than support, probable cause to believe [defendant] was the attempted shooter.").[30]

---

[30]While the Government contends that Smith and Plunkett felt "potentially threaten[ed]" by the fact that Farag returned not to his own ticketed seat but, rather, to the seat directly behind Smith, Gov't Br. at 15, there is no mention made in the Government's Rule 56.1 Statement that the agents were threatened. In any event, because probable cause is an "objective" determination, the agents' actual state of mind is irrelevant. *Zellner*, 494 F.3d at 369.  If the agents knew that Farag had taken the seat directly behind Smith because another passenger was in Farag's original seat and all other seats in the vicinity were taken, Farag's act would not be objectively threatening.

Nor could plaintiffs' conduct in the terminal be reasonably viewed as an escalation of events that would then have given rise to probable cause. *See United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004) ("The propriety of an officer's actions after an initial stop depends on . . . how events unfold."); *cf. Hooper*, 935 F.2d at 494-95 (noting that investigation conducted pursuant to a valid *Terry* stop had yielded probable cause to arrest). The Court fails to grasp the significance of Farag telling Smith that because he spoke Arabic he had been asked by the Bureau of Prisons to translate tapes, and that guns had been pointed at him as a police officer – both logical consequences of his past and present employments.

Reliance on Farag's nervousness and raised voice is also problematic. *See, e.g., United States v. Ten Thousand Seven Hundred Dollars and No Cents in U.S. Currency*, 258 F.3d 215, 226-27 (3d Cir. 2001) ("[C]laimants' apparent nervousness is of minimal probative value, given that many, if not most, individuals can become nervous or agitated when detained by police officers." (citation omitted)); *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998) ("[I]t is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity.") (internal quotation marks and citation omitted); *United States v. Crump*, 62 F. Supp. 2d 560, 565 (D. Conn. 1999) ("The fact that the defendant was acting 'a little nervous' has limited significance since most citizens, whether innocent or guilty, are likely to exhibit some signs of nervousness when confronted by the police." (citation omitted)). Moreover, Farag's "nervous" response to an unlawful show of force could not

retroactively justify plaintiffs' arrests. *See, e.g.*, *United States v. Alvarez-Manzo*, No. 8:07CR432, 2008 WL 2704163, at *8 (D. Neb. July 3, 2008) ("While the government argues that the arrest was supported by the defendant's nervous behavior, this behavior occurred after he was illegally seized . . . .").

In sum, viewed in the light most favorable to plaintiffs, the non-ethnic factors cited by the Government do not constitute probable cause.[31]

## 2. Would Consideration of Plaintiffs' Ethnicity Warrant a Finding of Probable Cause?

Allowing consideration of the plaintiffs' ethnicity and their use of Arabic would still not warrant a finding, in the context of the defendants' summary-judgment motion, that there was probable cause to arrest them. In other words, if the plaintiffs' view of events holds up at trial, their conduct was so benign that the ethnicity factor – even if it could be considered – would not change the outcome.

Nonetheless, the Court will address the ethnicity issue since the Government,

---

[31]Moreover, there are a host of imponderables which the plaintiffs should be able to explore at trial, further supporting the Court's conclusion that defendants are not entitled to summary judgment on the issue of probable cause. For example, it is unknown what exactly plaintiffs said to each other while conversing "loudly" on the plane; whether the agents clearly heard and understood the English portions of any of plaintiffs' mixed English-Arabic conversations; or whether the agents heard the conversation between Elmasry and the flight attendant. Further, plaintiffs take issue with the agents' portrayal of Elmasry's looking at his watch as "timing" events on the plane; at trial Elmasry will have the opportunity to explain when and why he looked at his watch, and will presumably testify that he made no written timing notations, consistent with the fact that the agents did not report that they saw Elmasry, who was sitting between them, reduce any of his numerous "timing" observations to writing. Additionally, plaintiffs would have the opportunity to question the agents as to whether they saw that another passenger had taken Farag's original seat, thus explaining his decision to take Elmasry's seat, rather than his own, at the end of the flight.

given the importance it ascribes to the issue, would otherwise undoubtedly raise it at trial; moreover, the issue would probably surface if Smith and Plunkett were to take an interlocutory appeal from the Court's denial of that aspect of their motion seeking qualified immunity. *See In re World Trade Center Disaster Site Litig.*, 521 F.3d 169, 180 (2d Cir. 2008) ("[A] district court's denial of immunity from suit is an appealable collateral order . . . 'to the extent that it turns on an issue of law.'") (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).

### 3. Can Plaintiffs' Arab Ethnicity Serve as a Probable Cause Factor?

The Government argues that plaintiffs' Arab ethnicity and use of the Arabic language are relevant factors in the probable-cause, as well as the reasonable-suspicion, calculus because "all of the persons who participated in the 9/11 terrorist attacks were Middle Eastern males[,]" Tr. of Oral Argument, July 18, 2008, at 18, and "the United States continues to face a very real threat of domestic terrorism from Islamic terrorists." Gov't Br. at 17.

The Government's position has some superficial appeal. After all, probable cause, and undoubtedly reasonable suspicion as well, is, once again, "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life[,]" *Delossantos*, 536 F.3d at 159 (internal quotation marks and citation omitted), and what American would not acknowledge that everyday life has changed in myriad ways, both great and small, since 9/11? Indeed, earlier this fall, the Second Circuit upheld a government program "that singled out male immigrants from two dozen

predominantly Arab and Muslim countries for accelerated deportation after the Sept. 11, 2001, terrorist attacks[,]" Mark Hamblett, *Circuit Upholds Post-9/11 Effort That Singled Out Muslim Men*, N.Y.L.J., Sept. 25, 2008 at 1, finding it a "plainly rational attempt to enhance national security." *Rajah v. Mukasey*, 544 F.3d 427, 2008 WL 4350021, at *5 (2d Cir. Sept. 24, 2008).

*Rajah*, however, did not deal with ethnicity in the context of probable cause or reasonable suspicion. Indeed, the Government recognizes that "[t]here is no single precedent that resolves this case," Tr. of Oral Argument, July 18, 2008, at 17, which presumably accounts for its view of the case as one of first impression.[32] Nevertheless, the interplay between race[33] and the Fourth Amendment is not a recent phenomenon; courts

---

[32]The Court's research disclosed three post-9/11 Fourth Amendment cases involving Arabs (or perceived Arabs) suspected of terrorist activity that touch on the ethnicity issue. In none of these cases, however, was the issue decided. In one case, the court recognized and discussed the issue, but declined to decide it because factors other than defendants' perceived Arab ethnicity gave rise to reasonable suspicion. *United States v. Ramos*, Cr. No. 04-10198-MLW, 2008 WL 4117184, at *9 (D. Mass. Aug. 29, 2008). In the second case, the court declined to dismiss plaintiffs' Fourth Amendment claims, finding it "doubtful" that probable cause existed even though, *inter alia*, "three of the Plaintiffs observed the Muslim Maghreb prayer at the gate before boarding [the airplane] . . . ." *Shqeirat v. U.S. Airways Group, Inc.*, 515 F. Supp. 2d 984, 994 (D. Minn. 2007). There was no discussion, however, of the proper role of ethnicity per se in the Fourth Amendment calculus. In the last such case, the officers pointedly avoided any reliance on Arab ethnicity. *See Shahit v. City of Detroit Police Officer Tosqui*, No. 04-71538, 2005 WL 134541, at *10 n.6 ("Defendants do not argue that the combination of Plaintiffs' ethnicity [and other factors] . . . created probable cause to arrest for terrorism-related activities.").

[33]For present purposes, the Court treats the "technically" distinct concepts of race and ethnicity as legal equivalents. *Iqbal v. Hasty*, 490 F.3d 143, 148 n.2 (2d Cir. 2007), *cert. granted sub nom. Ashcroft v. Iqbal*, --- U.S. ---,128 S.Ct. 2931 (2008). Moreover, the Court considers the fact that the plaintiffs spoke their native tongue, Arabic – as opposed to some other language equally unfamiliar to the agents – as inextricably

and commentators have long struggled with the issue of whether and to what extent race can be a relevant consideration in the decision to detain an individual. *See, e.g,* Samuel R. Gross & Katherine Y. Barnes, *Road Work: Racial Profiling and Drug Interdiction on the Highway*, 101 Mich. L. Rev. 651 (2002); Anthony C. Thompson, *Stopping the Usual Suspects: Race and the Fourth Amendment*, 74 N.Y.U. L. Rev. 956 (1999); Tracey Maclin, *Race and the Fourth Amendment*, 51 Vanderbilt L. Rev. 333 (1998); Sheri Lynn Johnson, *Race and the Decision to Detain a Suspect*, 93 Yale L.J. 214, 237 (1983). That legal backdrop obviously bears on the Court's analysis here.

At the outset, it should be understood that the Fourth Amendment – unlike the Equal Protection Clause – imposes no *a priori* restriction on race-based governmental action. As the Supreme Court noted in *Whren v. United States*, 517 U.S. 806 (1996):

> [T]he Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.

*Id.* at 813; *see also United States v. Scopo*, 19 F.3d 777, 786 (2d Cir. 1994) (Newman, J., concurring) ("Though the Fourth Amendment permits a pretext arrest, if otherwise supported by probable cause, the Equal Protection Clause still imposes restraint on impermissibly class-based discriminations."). *But see* Thompson, 75 N.Y.U. L. Rev. at 991-98 (arguing that the Framers intended the Fourth Amendment to protect political

related to, and legally indistinguishable from, plaintiffs' ethnicity per se.

minorities from selective governmental scrutiny).

In *Whren*, the existence of probable cause based on non-racial factors was conceded. *See* 517 U.S. at 810 ("Petitioners accept that Officer Soto had probable cause to believe that various provisions of the District of Columbia traffic code had been violated."). Thus, the Court opined only that an officer's subjective, potentially race-based motivations were irrelevant to the Fourth Amendment *once probable cause is established*; it was not called upon to address whether race might be relevant to the probable-cause analysis itself.

Although the Fourth Amendment does not single out race as a matter of special concern, it does impose a general requirement that *any* factor considered in a decision to detain must contribute to "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). Thus, as one commentator has observed, "race cannot affect probable cause or reasonable suspicion calculations unless it is statistically related to suspected criminal activity." Johnson, 93 Yale L.J. at 237. Whether such a relationship exists in a given case is necessarily a fact-specific inquiry; nevertheless, the case law reveals some recurring themes.

Perhaps the least controversial use of race in the context of the Fourth Amendment is its use as an *identifying* factor. If the victim of, or witness to, a crime describes the perpetrator as a young white male wearing a white shirt and black pants, there can be little doubt that law enforcement officials may consider that description in deciding whom to detain, even though the description is based, in part, on race. *See Brown*

*v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000) ("[Plaintiffs] were not questioned solely on the basis of their race. They were questioned on the altogether legitimate basis of a physical description given by the victim of a crime . . . [which] contained not only race, but also gender and age, as well as the possibility of a cut on the hand."); *People v. Johnson*, 478 N.Y.S.2d 987, 992 (4th Dep't 1984) ("[W]itnesses and victims frequently describe criminal perpetrators by the color of their skin. Where a suspect has been described by his race, it is a characteristic which may properly be used as one element of identification." (internal quotation marks and citations omitted)).

Courts have also confronted the so-called "racial incongruity" argument – i.e., that race is indicative of criminality when members of a particular race seem "out of place" in a particular location. Some courts – including the Second Circuit – have sidestepped the issue by finding probable cause or reasonable suspicion based on other, non-racial factors. For example, in *United States v. Magda*, 409 F. Supp. 2d 734 (S.D.N.Y. 1976), the district court found reasonable suspicion lacking where "[t]he reason for the stop was primarily because of an observed exchange . . . between a young black man and a young white man in an area of the city defined as 'narcotics prone.'" *Id.* at 740. The Second Circuit reversed, concluding that the circumstances and location of the transaction were sufficient to create reasonable suspicion; the circuit court made no mention of the race of the participants. *See United States v. Magda*, 547 F.2d 756, 758-59 (2d Cir. 1976); *see also United States v. Richard*, 535 F.2d 246, 248-249 (3d Cir. 1976) (noting that "the presence of two black males cruising in a car in a predominately white neighborhood is, by itself,

insufficient cause for a belief that those persons have participated in a recent crime in the neighborhood," but reversing suppression order based on other factors); *State v. Wilson*, 775 So. 2d 1051, 1052 (La. 2000) ("[T]he officer made clear . . . that while racial incongruity 'did factor in,' he considered other circumstances more important in his decision to make an investigatory stop.").

Those courts that have squarely addressed the incongruity argument have uniformly rejected it. *See People v. Bower*, 597 P.2d 115, 119 (Cal. 1979) ("[T]he presence of an individual of one race in an area inhabited primarily by members of another race is not a sufficient basis to suggest that crime is afoot."); *State v. Barber*, 823 P.2d 1068, 1075 (Wash. 1992) ("It is the law that racial incongruity, i.e., a person of any race being allegedly 'out of place' in a particular geographic area, should never constitute a finding of reasonable suspicion of criminal activity."); *Phillips v. State*, 781 So. 2d 477, 479 (Fla. Dist. Ct. App. 2001) ("Clearly, the fact that a black person is merely walking in a predominantly white neighborhood does not indicate that he has committed, is committing, or is about to commit a crime."). Even the Arizona Supreme Court – which Professor Johnson characterized as "extreme in requiring very little besides racial incongruity to justify a *Terry* stop," 93 Yale L.J. at 227 – withdrew its prior approval of the racial incongruity argument. *See State v. Graciano*, 653 P.2d 683, 687 n.7 (Ariz. 1982) (disapproving *State v. Ruiz*, 504 P.2d 1307 (Ariz. 1973)).

But this case involves neither identification nor racial incongruity. Rather, defendants' argument that plaintiffs' Arab ethnicity is a relevant consideration is premised

on the notion that Arabs have a greater *propensity* than non-Arabs toward criminal activity – namely, terrorism.

In support of this argument, defendants rely principally on language from the Supreme Court's opinion in *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975). There, a roving border patrol agent had made a traffic stop based on nothing more than "the apparent Mexican ancestry" of the car's occupants. *Id.* at 885. The Supreme Court held that "this factor alone would [not] justify . . . a reasonable [suspicion]" of an immigration violation. *Id.* at 886. But it stated – in dictum – that "[t]he likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance *a relevant factor*" in the Fourth Amendment calculus, if it were not *the only* basis for suspicion. *Id.* at 886-87 (emphasis added).[34]

*Brignoni-Ponce*'s dictum was predicated on 1970 census figures establishing that in the border states between 8.5% and 20.4% of the ethnic-Mexican population self-registered as aliens. *Id.* at 886-87 & n.12. To the Court's knowledge, no court has ever marshaled statistics to conclude that racial or ethnic appearance is correlated with, and

---

[34]A year after *Brignoni-Ponce*, the Supreme Court held that officials at a border-control checkpoint could constitutionally single out motorists for inspection "even if it be assumed that such referrals are made largely on the basis of apparent Mexican ancestry." *United States v. Martinez-Fuerte*, 428 U.S. 543, 563 (1976). The Court recognized that such a criterion "would not sustain a roving-patrol stop," *id.*, but concluded that border-control checkpoints were exempt from the usual Fourth Amendment requirement of individualized suspicion. *See id.* at 562 ("[W]e hold that the stops and questioning at issue may be made in the absence of any individualized suspicion at reasonably located checkpoints."). Since there is obviously no contention that a traditional arrest or *Terry* stop is similarly exempt from that requirement, *Martinez-Fuerte* cannot support plaintiffs' detention.

thus probative of, any type of criminal conduct *other than* immigration violations. *See, e.g.,* *United States v. Avery*, 137 F.3d 343, 354 (6th Cir. 1997) ("[A]lthough the Court in *Brignoni-Ponce* stated 'the likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor,' we refuse to adopt, by analogy, the concept that 'the likelihood that any given person of African ancestry is involved in drug trafficking is high enough to make African ancestry a relevant fact' in investigating drug trafficking . . . ." (citation omitted)).

Moreover, the statistical rationale behind the *Brignoni-Ponce* dictum does not translate to the present case: Even granting that all of the participants in the 9/11 attacks were Arabs, and even assuming *arguendo* that a large proportion of would-be anti-American terrorists are Arabs, the likelihood that *any given airline passenger* of Arab ethnicity is a terrorist is so negligible that Arab ethnicity has no probative value in a particularized reasonable-suspicion or probable-cause determination.[35] *Accord United States v. Ramos*, Cr. No. 04-10198-MLW, 2008 WL 4117184, at *9 (D. Mass. Aug. 29, 2008) (considering, in dicta, the applicability of *Brignoni-Ponce* to Arabs suspected of terrorist activity post-9/11, and noting that "[a]mong other things, the type of statistics relied upon in *Brignoni-Ponce* . . . have not been presented here."); *United States v. Nevitt*, 409 F. Supp. 1075, 1079 (D. Mich. 1976) ("In *Brignoni-Ponce*, . . . the Court held that apparent Mexican

---

[35]*Cf. Jones*, 149 F.3d at 369 (holding that even though officer "had it on good authority that smugglers . . . us[e] tourists. . . to bootleg illegal aliens, . . . the fact that [defendant] looked like a tourist does not give rise to [reasonable suspicion] . . . unless we are willing to say that tourists are involved in illegal activity often enough that just looking like a tourist is cause for suspicion. We are not so inclined.").

ancestry could be used as a relevant factor . . . . There, however, the Court specifically found, on the basis of statistical evidence, that 'the likelihood that any given person of Mexican ancestry is an alien is high enough' to justify its use as a factor.  In our case, the United States has presented no [statistical] evidence . . . ." (internal citation omitted)).

Indeed, the Ninth Circuit, whose judgment the Supreme Court upheld in *Brignoni-Ponce*, revisited *Brignoni-Ponce*'s dictum 25 years later and held, albeit also in dicta, that the statistical inference on which it was based was no longer valid, even in its original illegal-immigration context:

> *Brignoni-Ponce* was handed down in 1975, some twenty-five years ago. Current demographic data demonstrate that the statistical premises on which its dictum relies are no longer applicable. The Hispanic population of this nation, and of the Southwest and Far West in particular, has grown enormously . . . . Accordingly, Hispanic appearance is of little or no use in determining which particular individuals among the vast Hispanic populace should be stopped by law enforcement officials on the lookout for illegal aliens. Reasonable suspicion requires *particularized* suspicion, and in an area in which a large number of people share a specific characteristic, that characteristic casts too wide a net to play any part in a particularized reasonable suspicion determination.

*Montero-Camargo*, 208 F.3d at 1133-34 (emphasis in original).  Notably, the Supreme Court has never revisited its dictum in *Brignoni-Ponce,* nor has it ever addressed whether, *absent* compelling statistical evidence, race or ethnicity may be used as a factor in the Fourth Amendment calculus to indicate criminal propensity.  Accordingly, the Court finds that *Brignoni-Ponce* offers no support for the Government's position.

In respect to the Second Circuit, while it has spoken in ways that suggest that it would reject the Government's contention, it has *also* used equivocal language. In *United States v. Swindle*, a drug-possession case, the circuit court held that an African-American defendant's Fourth Amendment rights were violated when he was stopped by the police "simply [for being] a black man in a high-crime area driving a car that the wanted fugitive had previously been seen 'near.'" 407 F.3d 562, 570 (2d Cir. 2005). The circuit court noted that the defendant's race matched the fugitive's, but stated that race was "the only obvious physical characteristic the men shared[,]" suggesting that race – while a valid identifying factor – cannot serve as the *only* identifying factor. *Id.* at 569; *cf. Montero-Camargo*, 208 F.3d at 1134 n.22. The court then stated: "courts agree that race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop." *Id.* at 569-70 (citations omitted). This use of the qualifier "*sometimes* even in tandem with other factors," *id.* (emphasis added), is unexplained; it may or may not simply be that the court intended to signify that the use of race in the reasonable-suspicion calculus is prohibited *except* when it serves as one of several identifying factors.

In *Almeida-Amaral v. Gonzales*, the Second Circuit, discussing when a Fourth Amendment violation based on an illegal border-patrol stop would justify suppression of evidence obtained as a result of the stop in a civil deportation proceeding, noted – in dicta – that, "were there evidence that the stop was based on race, the violation would be egregious, and the exclusionary rule would apply." 461 F.3d 231, 237 (2d Cir. 2006); *see also id.* at 235 ("[A] seizure . . . may . . . qualify as an egregious violation if the stop was based

on race (or some other grossly improper consideration)." (footnote omitted)).[36] While the circuit court did not discuss stops based *partially* on race, this sweeping condemnation of racial considerations may well be taken as an indication that the Second Circuit would reject the Government's contention that plaintiffs' ethnicity could be considered as one factor in the Fourth Amendment calculus.

Although the question whether race or ethnicity may be used as one factor among others in evaluating reasonable suspicion or probable cause (outside of the identification scenario, and absent any compelling statistical evidence) remains unresolved by either the Supreme Court or the Second Circuit, there is a significant body of pre-9/11 precedent concluding that race is not indicative of criminal propensity. The Ninth Circuit's decision in *Montero-Camargo* is one example; although the *en banc* court held that there were sufficient non-ethnic factors to constitute reasonable suspicion to stop the defendants, the majority rejected the district court's and the panel majority's "reli[ance] in part upon the Hispanic appearance of the three defendants[,]" 208 F.3d at 1131, concluding that "Hispanic appearance is, in general, of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is

---

[36]The Second Circuit was interpreting and applying the Supreme Court's holding in *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984), that "a Fourth Amendment violation does not, by itself, justify suppression of evidence in the course of a civil deportation proceeding . . . ." *Almeida-Amaral*, 461 F.3d at 234 (citing *Lopez-Mendoza*, 468 U.S. at 1039). However, as the circuit court noted, the Supreme Court had "explained that its holding did not necessarily pertain to circumstances involving 'egregious violations of [the] Fourth Amendment . . . that might transgress notions of fundamental fairness [or] undermine the probative value of the evidence obtained.'" *Id.* (quoting *Lopez-Mendoza*, 468 U.S. at 1050-51).

required . . . ." *Id.* at 1135. Similarly, in *United States v. Clay*, the Eighth Circuit held that the defendant's race, considered together with several other factors, did not create reasonable suspicion for a *Terry* stop, stating that "[a]lthough color of skin is an identifying factor, this court has consistently rejected the use of race *in combination with other factors* to justify investigative searches and seizures." 640 F.2d 157, 159 (8th Cir. 1981) (citations omitted) (emphasis added).

In *United States v. Ruiz*, a Utah district court held that no seizure cognizable under the Fourth Amendment had occurred, but nevertheless stated in dicta that, while race may be used to identify a suspect, "general circumstances of a person's race or ethnicity *are not a proper factor* in determining reasonable suspicion or probable cause[,]" noting that "[t]he overwhelming majority of Hispanics are not involved in drug trafficking or any other criminal endeavor . . . ." 961 F. Supp. 1524, 1532 (D. Utah 1997) (emphasis added). And in *United States v. Hayden*, an Iowa district court found no reasonable suspicion to justify a *Terry* stop based on the fact that defendants were in a parked rental car registered to a car-rental company located four-and-a-half hours away. The defendants had alleged that the officer stopped them based on their race; while the court found no evidence to support this, it noted in dicta that "defendants' race would provide no basis for a reasonable suspicion, and it would be fundamentally wrong for an officer to act, *even in small part*, on the basis of a motorist's race." 740 F. Supp. 650, 653 (S.D. Iowa 1990) (emphasis added).

Various state courts have come to similar conclusions. In *People v. Johnson*,

a New York Appellate Division held that reasonable suspicion existed based both on non-racial factors and on the fact that the defendant's race matched the suspect's – i.e., based on an *identifying* use of race; in passing, however, the court noted that "[a] person's racial status is . . . [not independently] probative of propensity to commit crime, and it does not provide a basis to conclude that crime is afoot" in situations where police are not already seeking a suspect with a particular racial appearance. 478 N.Y.S.2d 987, 993 (4th Dep't 1984). In *State v. Kuhn*, a New Jersey intermediate appellate court held that a police officer had lacked reasonable suspicion that the defendant was purchasing illegal drugs where, *inter alia*, the defendant was a Caucasian who had been speaking with two Hispanic individuals. The court held that race "may not be considered" because "[n]o rational inference may be drawn from the race of one to be detained that he may be engaged in criminal activities." 517 A.2d 162, 165 (N.J. Super. Ct. App. Div. 1986). And in *Lowery v. Commonwealth*, the government had argued that "in addition to the other observations made by the state police officer, the defendant's race was a permissible factor in the decision to stop his vehicle." 388 S.E.2d 265, 267 (Va. Ct. App. 1990). Although the Virginia Court of Appeals found reasonable suspicion based on non-racial factors, it stated in dicta that race was an impermissible consideration, concluding that "use of a person's race or national origin to justify a vehicle stop to investigate drug trafficking . . . . violates . . . the [F]ourth [A]mendment . . . . [I]t is unreasonable for the police to consider the apparent race or national origin of the suspect as a factor in determining whether . . . there is reason or probable cause to believe that the suspect is trafficking in drugs, except when

used to describe a previously identified suspect."  *Id.* at 267.

The Court is aware of only one case holding that race can be coupled with other factors to establish criminal propensity, absent the type of compelling statistical evidence relied upon in *Brignoni-Ponce*.  *See United States v. Weaver*, 966 F.2d 391, 394 (8th Cir. 1992) ("[T]he unpleasant fact in this case is that [the detaining officer] had knowledge, based on his own experience and upon the intelligence reports he had received from the Los Angeles authorities, that young male members of black Los Angeles gangs were flooding the Kansas City area with cocaine.").  The remainder of the federal and state-court precedent cited above, however, clearly evidences what has been described as an increasing "hostil[ity] to the use of race as a basis for police action under the Fourth Amendment."  Gross & Barnes, 101 Mich. L. Rev. at 736.[37]

There is no doubt that the specter of 9/11 looms large over this case.  Although this is the first post-9/11 case to address whether race may be used to establish

---

[37]Plaintiffs have not asserted an *equal protection* claim under the Fifth Amendment, and the Court expresses no opinion on the viability of such a claim here. However, while equal-protection doctrine does not directly bear on the Court's analysis, the Court nevertheless is mindful that sanctioning the equation of race with criminal propensity under the Fourth Amendment would create tension with the Supreme Court's recent equal-protection jurisprudence, which has imposed increasingly strict limits on the use of race in government action.  *See Montero-Camargo*, 208 F.3d at 1134-35 ("The danger of stigmatic harm of the type that the [Supreme] Court feared overbroad affirmative action programs would pose is far more pronounced in the context of police stops in which race or ethnic appearance is a factor.  So, too, are the consequences of 'notions of racial inferiority' and the 'politics of racial hostility' that the [Supreme] Court pointed to [in striking down affirmative action progams] . . . . It would be an anomalous result to hold that race may be considered when it harms people, but not when it helps them.") (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989)).

criminal propensity under the Fourth Amendment, the Court cannot subscribe to the notion that in the wake of 9/11 this may now be permissible. As the Second Circuit recently admonished, "the strength of our system of constitutional rights derives from the steadfast protection of those rights in both normal and unusual times." *Iqbal v. Hasty*, 490 F.3d 143, 159 (2d Cir. 2007), *cert. granted sub nom. Ashcroft v. Iqbal*, — U.S. — ,128 S.Ct. 2931 (2008).

History teaches much the same lesson: The Supreme Court's approval of the internment of large numbers of Japanese-Americans during World War II, *see Korematsu v. United States*, 323 U.S. 214 (1943), is now widely regarded as a black mark on our constitutional jurisprudence. The daughter of two such internees – Kiyo Matsumoto – recently became the third Asian-American woman to be elevated to the federal bench. At her induction ceremony, Judge Matsumoto recalled the closing words of Justice Murphy's dissent in *Korematsu*; they are equally apt here:

> All residents of this nation are kin in some way by blood or culture to a foreign land. Yet they are primarily and necessarily a part of the new and distinct civilization of the United States. They must accordingly be treated at all times as the heirs of the American experiment and as entitled to all the rights and freedoms guaranteed by the Constitution.

323 U.S. at 206.

The Court "fully recognize[s] the gravity of the situation that confront[s] investigative officials of the United States as a consequence of the 9/11 attack[,]" *Iqbal*, 490 F.3d at 159 (2d Cir. 2007), and that the mindset of airline travelers has understandably been

altered by 9/11. This justifiable apprehension must be assuaged by ensuring that security is strictly enforced, and by the passage of time without, hopefully, other episodic affronts to our country; but fear cannot be a factor to allow for the evisceration of the bedrock principle of our Constitution that no one can be arrested without probable cause that a crime has been committed.

## C. Are Smith and Plunkett Entitled to Qualified Immunity?

"As a general rule, police officers are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Oliveira*, 23 F.3d at 648 (citations omitted). Whether a constitutional right is clearly established depends on whether is has been "defined with reasonable clarity . . . [by] the Supreme Court or the Second Circuit . . . ." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (quoting *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003)). "When neither the Supreme Court nor [the Second Circuit] has recognized a right, the law of [other] circuits and the holdings of district courts cannot act to render that right clearly established within the Second Circuit." *Pabon v. Wright,* 459 F.3d 241, 255 (2d Cir. 2006) (citation omitted).

If the constitutional right was clearly established, the "objectively reasonable" prong would be satisfied "if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Walczyk*, 496 F.3d at 154 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *see also Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (stating that officer would be entitled to qualified immunity if "officers of

reasonable competence could disagree on whether the probable cause test was met" (citation omitted)).  On the other hand, "if, on an objective basis, it is obvious that no reasonably competent officer would have concluded" that the action in question would be lawful, "[d]efendants will not be immune . . . ." *Zellner*, 494 F.3d at 367 (internal quotation marks and citation omitted).

There is no question but that "[t]he right not to be arrested in the absence of probable cause [was] . . . well-established[,]" and that "an unreasonably intrusive detention could not be justified as a *Terry* stop and thus would need to be supported by probable cause." *Oliveira*, 23 F.3d at 648 (citations omitted).   But these are broad, generalized principles, and the law requires a "more particularized" view of the relevant legal standard. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Lauro v. Charles*, 219 F.3d 202, 214-15 (2d Cir. 2000) ("While the general principle of the Fourth Amendment . . . is well-established, that principle in itself is not enough to warrant a finding that any particular violation of the principle should be clear to a reasonable police officer." (internal citation omitted)).   "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (citations omitted).

In that regard, although the Court has embraced the decisions of out-of-circuit federal courts and state courts concluding that ethnicity cannot be considered as a factor in the Fourth Amendment calculus, and although those decisions are bolstered by

Second Circuit dicta in other contexts, that neither the Supreme Court nor the Second Circuit had previously so held means that this principle cannot be considered as having been clearly established.

This is not, however, the end of the qualified-immunity issue. It is beyond question that perceived ethnicity *alone* cannot give rise to reasonable suspicion or probable cause, *see Brignoni-Ponce*, 422 U.S. 873 at 886-87 – otherwise, officers would be entitled to qualified immunity for arresting airline passengers solely for conversing in their native language, be it French, Spanish or, as here, Arabic. Thus, the agents would not be entitled to qualified immunity if there were insufficient non-ethnic factors supporting plaintiffs' seizures and detentions. This determination turns on "the particular facts of the case." *Zellner*, 494 F.3d at 368 (quoting *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)). Consequently, although "[t]he ultimate question of . . . whether officers of reasonable competence could disagree as to the lawfulness of [Smith and Plunkett's] conduct . . . is to be decided by the court[,]" *id.* at 367, "the factual questions [on which this determination turns] must be resolved by the factfinder." *Id.* at 368; *see, e.g., Stephenson v. Doe*, 332 F.3d 68, 80 (2d Cir. 2003) ("[T]here are material issues of fact set forth below that preclude summary judgment on [the] basis [of qualified immunity]."); *Oliveira*, 23 F.3d at 650 (remanding for trial on the issue of qualified immunity where "[factual] disputes bear directly upon whether it was objectively reasonable for the officers to believe that they were acting lawfully").

For example, if the jury[38] were to find that the agents knew or should have known that Elmasry was not suspiciously "timing" events; that the agents knew or should have known why plaintiffs changed their seats; and that the agents heard and understood enough of the *English* portions of plaintiffs' mixed Arabic-English conversations to place their actions in context, the Court could not grant the agents qualified immunity. Under such circumstances, there would be no factual justification for the agents' actions other than plaintiffs' ethnicity, and no *reasonable* officer would have thought it appropriate to arrest or investigatively detain an Arab simply for speaking Arabic on an airplane – whether before or after 9/11. Thus, because of the factual nature of the qualified immunity issue, summary judgment cannot be granted.[39]

On a concluding note, nothing that the Court has written should be construed as suggesting that law enforcement officials should be anything but vigilant in policing suspicious conduct on domestic airline flights. Moreover, "individuals consent to substantial intrusions on their Fourth Amendment interests at airports and onboard commercial aircraft." *Shqeirat v. U.S. Airways Group, Inc.*, 515 F. Supp. 2d 984, 993 (D. Minn. 2007) (citing *Cassidy v. Chertoff*, 471 F.3d 67, 76 (2d Cir. 2006) ("[S]ociety has long accepted a heightened level of security and privacy intrusion with regard to air travel.")).

Certainly, the agents could have engaged the plaintiffs in consensual

---

[38]Plaintiffs have demanded a jury trial. *See* Compl. at 1.

[39]It should once again be kept in mind that the Court has accepted plaintiffs' versions of events only for summary-judgment purposes. Thus, at trial, the Government would be free to challenge them.

conversation. *See Royer*, 460 U.S. at 497-98 ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual . . . in [a] public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions."); *United States v. Lee*, 916 F.2d 814, 816-19 (2d Cir. 1990) (holding that, where officers approached a suspicious person in an airport terminal "and, with credentials displayed, asked if they could speak with him"; the individual consented; the officers told him "that he was suspected of carrying contraband"; and he consequently allowed them to search his person; the encounter did not implicate the Fourth Amendment).[40] For aught that appears on the present record, the plaintiffs were more than willing to answer any questions put to them and give the agents whatever information they may have required. And if the plaintiffs had fully cooperated by telling the agents where they worked and, in Farag's case, giving his federal employee tax identification number, the agents should have been able to quickly confirm whether plaintiffs were being truthful.

The trial will flush all this out, as well as whether there was ever any danger

---

[40]Although such a consensual encounter would not have qualified as a "seizure," and therefore would not trigger Fourth Amendment scrutiny, the Court notes that even consensual questioning may violate the constitution where race or ethnicity is the *sole* reason for the officer's approach. *See Avery*, 137 F.3d at 354 ("[Airport] surveillance could not be challenged under the Fourth Amendment because it does not involve a seizure. The Fourteenth Amendment, however, prohibits agents from engaging in investigative surveillance of an individual based solely on impermissible factors such as race."); *United States v. Travis*, 62 F.3d 170, 173 (6th Cir. 1995) ("[C]onsensual searches may violate the Equal Protection Clause when they are initiated solely based on racial considerations . . . even though they are permissible under the Fourth Amendment.").

to the safety of any of the passengers or to the officers, and whether there was any justification to believe that an act of terrorism was in progress.

**Remaining Claims**

Plaintiffs' complaint alleges three additional claims that clearly lack merit, with respect to which the Court grants summary judgment in the Government's favor. First, plaintiffs allege that Smith and Plunkett "conspired [with one another and/or with the Port Authority officers] . . . to violate Plaintiffs' [Fourth and Fifth Amendment] right[s] . . . ." Compl. ¶¶ 69, 83.  To establish such a conspiracy, a plaintiff must, *inter alia*, "provide some factual basis supporting a meeting of the minds, such as that defendants entered into an agreement, express or tacit, to achieve the [violation of plaintiff's constitutional rights]."  *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000) (internal quotation marks omitted) (Section 1983 conspiracy); *accord Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991) (*Bivens* conspiracy).  Plaintiffs, however, have adduced no evidence whatsoever of a "meeting of the minds" whose *conscious objective* was to deprive plaintiffs of their constitutional rights; that Smith and Plunkett presumably had a "meeting of the minds" when they *agreed to detain plaintiffs* is insufficient.

Second, plaintiffs bring false-arrest and false-imprisonment claims against Smith under New York common law.  But Smith, although officially employed by the City of New York, was acting as a specially deputized agent under the authority of the FBI's Joint Terrorism Task Force at the time of these events.  Thus, Smith was acting under color of *federal* law, not state law, and common-law claims against federal actors are foreclosed

by the FTCA.  *See* 28 U.S.C. § 2679 (suit against the United States under FTCA is "exclusive" remedy for torts committed by "any employee of the Government while acting within the scope of his office or employment").  This is as true for specially deputized temporary agents as for any other federal actor.  *See* 5 U.S.C. § 3374(c)(2) ("a State or local government employee on detail to a Federal agency . . . is deemed an employee of the agency for the purpose of . . . the Federal Tort Claims Act").

Finally, plaintiffs allege that Smith and Plunkett committed race discrimination in violation of 42 U.S.C. § 1981.  Section 1981 claims do not lie against federal actors.  *See* 42 U.S.C. § 1981(c); *Dotston v. Griesa*, 398 F.3d 156, 162 (2d Cir. 2005) (dismissing § 1981 claim where defendant acted "pursuant to . . . authority under federal, not state, law").  Once again, Smith – and, *a fortiori*, Plunkett – was acting under color of *federal*, not state law.

## CONCLUSION

For the reasons described above, the Court grants summary judgment in the Government's favor with respect to plaintiffs' conspiracy claims, plaintiffs' common-law claims against Smith, and plaintiffs' § 1981 claims.  The Court denies summary judgment with respect to plaintiffs' *Bivens* claims against Smith and Plunkett, plaintiffs' FTCA claims against the United States, and Smith and Plunkett's qualified-immunity defense.

**SO ORDERED.**

_____

FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
November 24, 2008